**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**JOHN BRACEY**                                                                  **PLAINTIFF**

**VS.**            **CASE NO.:  4:13-cv-00013-JM-JTR**

**LITTLE ROCK, ARKANSAS, CITY OF**                          **DEFENDANT**

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge James M. Moody, Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## I.  Introduction

Plaintiff John Bracey ("Bracey") is an African-American who was formerly employed as a police officer for Defendant City of Little Rock ("City"). After the City terminated his employment, he initiated this action alleging he was terminated because of his race, in violation of Title VII of the Civil Rights Act, as amended; 42 U.S.C. § 1981; and 42 U.S.C. § 1983. *(Doc. 1)*.

1

The City has filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts.[1]  (*Docs.* 34-36).   Bracey has filed a Response, Brief in Support and Statement of Facts.  (*Docs. 42-44, 48).*   The City has filed a Reply.  (*Doc. 55*).   Thus, the City's Motion for Summary Judgment is ripe for decision.

## II.  Recitation of Material Facts

Before addressing the merits, the Court will recite the material facts relevant to the resolution of the Motion.  Virtually all of these facts are undisputed.  The few material facts in dispute are explicitly noted by the Court, and it has viewed all of those disputed facts in a light most favorable to Bracey, the non-moving party. *Brown v. City of Jacksonville*, 711 F.3d 883, 885 n. 3 (8th Cir. 2013).

### A.      Bracey's Employment and Later Termination

1.      On September 11, 1995, the Little Rock Police Department ("LRPD") hired Bracey as a patrol officer.  He worked in that position until his termination

---

[1]  Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

"While employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary judgment standard for employment discrimination cases." *Fercello v. Cnty. Of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).

on May 11, 2012.   During his career, Bracey became a respected, veteran police officer.  (Complaint, *Doc. 1* at ¶ 5;  Termination Letter, *Doc. 34-4* at pp. 1-2; Letter, *Doc. 48-1*).

2.    LRPD Police Chief Stuart Thomas ("Chief Thomas") was the final decision-maker who terminated Bracey.[2]  Chief Thomas based that decision on: (a)  an Internal Affairs ("I/A") investigation into Bracey's misconduct *during* and *after* a domestic violence incident with his wife; (b) an administrative hearing on Bracey's alleged misconduct;  and (c)  the recommendations of Bracey's chain of command.  (Thomas Aff., *Doc. 34-3* at pp. 3-6).

3.    Chief Thomas's termination letter, dated May 11, 2012, advised Bracey that he was being discharged for violating the following:

### General Order 310 - § VIII.J.1

"Any sworn member of this Department who witnesses or has firsthand knowledge of a domestic violence related incident involving a sworn member of this Department as the alleged suspect and who fails to officially report this information, will be subject to disciplinary action up to and including termination."

### Rules and Regulations - §1/4002.00

"Officers shall not engage in any conduct which constitutes conduct unbecoming an officer or neglect of duty."

### Rules and Regulations - §1/4003.00

---

[2]   Thomas served as Police Chief from April 11, 2005 until his retirement on June 30, 2014. (Thomas Aff., *Doc. 34-3* at p. 1, ¶ 1).

Under the LRPD's General Order 211, which governed the disciplinary process at the time of Bracey's termination, the Chief of Police was responsible to make "a final determination" based on the recommended discipline.  (*Doc. 34-3* at pp. 1-2, 12, 15).

"No officer shall engage in any personal act or conduct which, if brought to the attention of the public, could result in justified criticism of that officer or the Department.  No officer shall be personally involved in disturbances or police incidents to his/her discredit."

### Rules and Regulations - § 1/5006.00

"Failure or deliberate refusal of any officer to obey a lawful order given by a supervisory officer of this Department shall be considered insubordination."

### Rules and Regulations - § 1/8005.00

"No officer shall willfully misrepresent any matter, sign any false statement or report, commit perjury or give false testimony before any court, grand jury, commission, official hearing or departmental hearing or investigation."

(Termination letter, *Doc. 34-4* at pp. 1-2).

4.      Chief Thomas's termination letter also described Bracey's specific misconduct that constituted violations of General Order 310 and Rules and Regulations ("R&R") §§ 1.4002.00, 1.4003.00, 1/5006.00, and 1/8005.00:

(1)      You [Bracey] were involved in a domestic disturbance with your wife, Mary Bracey, on December 9, 2011, in which you choked and struck her in the face;

(2)      You [Bracey] failed to report the domestic disturbance, which resulted in the police being dispatched;

(3)      You [Bracey] left the scene and evaded apprehension for several days that resulted in a warrant being obtained for your arrest;

(4)      You [Bracey] failed to obey a direct order from supervisors to report to the Downtown Patrol Division on several occasions;

(5)      You [Bracey] made untruthful statements to supervisors and during your Internal Affairs' interview.

4

(Termination letter, *Doc. 34-4* at p. 2).[3]

5.    A domestic dispute occurred on Friday, December 9, 2011, at the Little Rock home Bracey shared with his wife, Mary Bracey.  Earlier in the week, Mary raised the possibility of their 14-year-old son, Markus, going on a hunting trip with one of her male friends, and this resulted in an argument.[4]  (Stmt. of Facts, *Doc. 43* at ¶¶ 13-15).

6.    On Friday afternoon, after school, Bracey and Mary again discussed the issue of Markus going hunting with one of Mary's male friends.  Both Markus and his sister, Marissa, were present.[5]  Bracey "grabbed the computer" Mary was using, "threw it in the kitchen,'" and asked her if she understood what he was saying.  Mary then grabbed the laptop computer that Marissa was using.  In doing so, Bracey later claimed that Mary hit herself in the face with the laptop, which was still attached to headphones Marissa was wearing.  According to Bracey, he started laughing;  Mary "chest-bumped" him; and then she began hitting him. Bracey claims he:  grabbed his wife "to restrain her;"  put his right hand under her

---

[3]  The Eighth Circuit has instructed that "the critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying the discharge."  *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-862 (8th Cir. 2012);  *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002-1003 (8th Cir. 2012) (reaffirming "honest belief rule" and the fact that an employer's belief turns out to be wrong is not enough to prove discrimination).

[4]   This is not to suggest the hunting trip was their only issue.  The Braceys were apparently already in discussions about a possible divorce.

[5]  Marissa was eight years old.

lip and above her chin; and pushed her back down on the couch.  He then told her to stop hitting him.  (Bracey depo., *Doc. 34-1* at pp. 29-34;  Bracey statement, Doc. 34-4 at pp. 4-5;  Bracey hearing testimony, at pp. 38-40).

7.     Bracey's version of the fight is disputed by both Markus and Mary. During or shortly after the fight started, Markus ran out of the house and called 911.  He reported to the police dispatcher that Bracey "started choking" his mom and that Bracey might be armed.  Mary Bracey also called 911, separately, and reported that Bracey had hit her.[6]  (*Doc. 34-5*, at pp. 1, 3-4, 11;  *Doc. 34-4*, at p. 22).

8.     After the fight, Bracey left his residence with Marissa, who voluntarily accompanied him.  Bracey drove to the parking lot of Playtime Pizza in West Little Rock.  (*Doc. 43* at ¶ 19).

9.     Bracey and Marissa remained at Playtime Pizza for about 1 hour. During that time, Bracey received a phone call from Little Rock Police Officer Amber Kalmer, who advised him that:  (a)  police officers were on their way to his house; and (b)  Mary had alleged that Bracey hit her.  Bracey told Officer Kalmer that Mary must have called 911.  (*Doc. 43* at ¶ 20).

---

[6]  Markus has submitted an Affidavit, which the City relies on to support its Motion for Summary Judgment.  Attached to his Affidavit is a transcript of his 911 call and a portion of Mary's 911 call.  (*See Doc. 34-5* at pp. 11-12).

10.     Although Bracey knew that Little Rock police officers were on their way to his residence, he left Playtime Pizza, drove with Marissa to a hotel in Saline County, and remained there for the rest of the night.  (*Doc. 43* at ¶ 21).

11.     According to Bracey, he believes his wife told the investigating officers that he hit her as part of a scheme to gain custody of their children in a divorce proceeding that he anticipated she would file.  Bracey thought that, if he returned to his home to meet the police officers investigating the incident, they would not believe his version of events because he is black and his wife is white.[7] (*Doc. 43* at ¶ 21).

12.     Later that evening, shortly after 7:00 p.m., Bracey received a voicemail on his cell phone from Sergeant Sloan, a Little Rock Police Officer. Sloan's message asked Bracey if he was okay.  Bracey responded with a text message, stating: "10-4."  (*Doc. 43* at ¶ 22).

13.     That same evening, Bracey also texted and spoke by phone with Sergeant Zebbie Burnett, another Little Rock police officer.  He offered Bracey assistance in hiring a lawyer to represent him in defending possible criminal charges arising from his physical altercation with his wife.  He also asked Bracey if

---

[7]   Bracey had been an LRPD officer for 17 years and undoubtedly had many friends on the force.  Because Bracey didn't know which officers might show up at his house, he had no way of knowing if they might be his friends or even share his ethnicity.  For Bracey to suggest that those unknown officers would disbelieve his story simply because he was married to a white woman strains credulity.

he had been in contact with anyone from the Black Police Officers' Association. Finally, Burnett told Bracey that the LRPD had broadcast a BOLO ("Be On the Look-Out") describing Bracey as armed and dangerous. (*Doc. 43* at ¶¶ 22, 24).

14.    Bracey's direct supervisor was Sergeant Clarence Davis, not Sergeant Sloan or Sergeant Burnett.  Bracey failed to contact Sgt. Davis, or anyone else in his chain of command, to report his personal involvement in a domestic incident with Mary Bracey.  The explicit language of General Order 310 required Bracey to "officially report" that domestic incident to Sergeant Davis, his supervisor, or another officer in his chain of command.[8]   (*Doc. 43* at ¶ 23).

15.    On Saturday morning, December 10, 2011, Bracey took Marissa home and then drove to a casino in Greenville, Mississippi.  About 12:20 p.m., Bracey received a telephone call from Sergeant Sloan.  He told Bracey that Lieutenant Speer, who was in Bracey's chain of command, had directed Sergeant Sloan to call Bracey and given him a direct order to report to the VA in Little Rock at 1:00 p.m.

---

[8]    It is undisputed that Bracey:  (1)  had "firsthand knowledge of a domestic violence incident" between him and his wife;  (2)  knew his wife had made a 911 call and told the dispatcher Bracy had "hit her";  (3)  knew that police officers had been dispatched to his residence to investigate the incident;  and (4)  knew he was "the alleged suspect."  This unquestionably required Bracey to officially report the incident to his supervisor or someone in his chain of command or "be subject to disciplinary action up to and including termination." (General Order 310, quoted at *Doc. 34-4*, p. 1).

that day (Saturday) to be "officially relieved of duty."  Bracey told Sergeant Sloan that there was no way he could comply with that order.[9]  (*Doc. 43* at ¶¶ 24, 32).

16.     On Sunday, December 11, 2011, Bracey left the casino in Mississippi and returned to Little Rock.    On Monday, December 12, 2011, Bracey turned himself in at the Little Rock District Court Third Division.[10]  (*Doc. 43* at ¶¶ 25, 26).

**B.     The City's Investigation of Bracey's Misconduct**

17.     Shortly after the December 9, 2011 domestic incident between Bracey and his wife, Chief Thomas indirectly learned what had happened.    He immediately authorized an I/A investigation.    Chief Thomas assigned the investigation to Officer Robert Mourot.[11]  (Thomas Aff., *Doc. 34-3* at pp. 2-3, ¶¶ 4-5).

---

[9]     Bracey testified at his administrative hearing that, although Sergeant Sloan communicated this direct order to him, it was "a direct order that could not be fulfilled" because he could not drive from Greeneville, Mississippi to Little Rock in 50 minutes.  This led Bracey to conclude that the order "could not be considered a lawful order."  Bracey also testified that he advised Sergeant Sloan that he planned to turn himself in on Monday.  (*Doc. 34-4* at p. 35).

[10]     According to Bracey, all of his actions on Saturday and, thereafter, were based on the advice he received from his attorney, Marshall Nash.  While Bracey may have relied on that "advice," it in no way can excuse his actions, after the domestic incident, which violated four different LRPD Rules and Regulations and one General Order.

        After turning himself in, Bracey was placed on administrative leave, with pay, where he remained until his termination on May 11, 2012.

[11]     This set in motion the process and procedures outlined in General Order 211, a copy of which is attached to Chief Thomas's Affidavit.  (*Doc. 34-3*, at pp. 12-31).  Upon completion of the internal investigation, General Order 211 specifies that the assembled file "gathered during the investigation" must be "forwarded to the involved employee's Chain of Command for review and evaluation" and for "recommendations regarding the disposition of each allegation."  (*Id.* at p. 18).

18.    Bracey was interviewed twice by I/A officers.  In his initial interview, he told I/A that, on the night of the fight with his wife, the *only person* from the LRPD he spoke to was Sergeant Sloan.  Bracey did not truthfully disclose that he also had spoken with LRPD Sergeant Zebbie Burnett.  (*Doc. 43* at ¶¶ 26, 27; *Doc. 34-4*, at pp. 6-7).

19.    Bracey gave a second I/A interview on December 15, 2011, during which he admitted his left hand "fell around her [Mary's] neck" as he held her head and chin to restrain her.  During the interview, Bracey was shown photographs of his wife's injuries, which depicted abrasions and redness or bruising on her left forehead and eyebrow, left check, and neck (both sides).  The injuries to her neck were consistent with being choked, something Markus reported in his 911 call and something Bracey seemed to admit in his second I/A interview when he said his left hand "fell around her neck."  Nevertheless, Bracey claimed that *all* of the injuries to his wife, including the injuries to her neck, were caused by her *striking herself* with Marissa's laptop computer, or Bracey "defending himself."  (*Doc. 34-4* at p. 23-24;  Photos, *Doc. 34-3*, pp. 32-34).

---

Bracey does not dispute that General Order 211 applied or was followed.  He does, however, make the conclusory allegation that Chief Thomas was inadequately trained and deliberately indifferent to Bracey's right to be free from unlawful discrimination.  (Complaint, *Doc. 1* at ¶ 18).  Bracey's Response to the City's Motion for Summary Judgment provides *no facts* to support that allegation.

20.    After considering all of the facts associated with Bracey's physical altercation with his wife, an initial decision was made to charge him with felony "aggravated assault on family or a household member."[12]  Eventually, Bracey was charged with misdemeanor domestic battery, third degree.[13]  That charge was later dropped.[14]  (Complaint, *Doc. 1* at ¶ 9;  Thomas Aff., *Doc. 34-3*, ¶5).

21.    On February 21, 2012, Bracey received a written Notice of Intent advising him that a disciplinary action was being considered against him based on the results of the I/Ainvestigation.   The Notice informed him of the charged violations, the alleged acts supporting the charges, and his right to an administrative hearing.  (*Doc. 43* at ¶ 29;  *Doc. 34-3*, at ¶7).

22.    During the administrative hearing, which was conducted on March 14, 2012, Bracey testified that he believed the LRPD was going to "presume his guilt" because his wife was white.  He also testified about perceived deficiencies in his wife's statement and in the LRPD's investigation.  Bracey produced a photograph of his wife's injuries that was taken by their son Markus.  Bracey believed the photograph supported his story that the injuries to her face were caused by Mary

---

[12]   *See* Ark. Code Ann. § 5-13-204.
[13]   *See* Ark. Code Ann. § 5-26-305 (the charge can be a felony if committed against a pregnant woman or the offender has prior battering offenses).
     While the record does not directly address why the initial felony charge was reduced, it appears to have been based on Mary Bracey deciding she did not want to pursue the more serious charge.
[14]    The record suggests that, on December 12, 2011, Mary Bracey sent a detective a text message stating she wanted to drop the charges, and on December 14, 2011, she presented a handwritten note to the same effect.  (*Doc. 34-3* at p. 51).

striking herself with Marissa's laptop.[15]  The picture showed, among other injuries, a straight bruise on Mary's face, which Bracey contended was consistent with the edge or side of a laptop computer striking her face.[16]  (*Doc. 43* at ¶ 30).

23.     Sergeant Chunda Owens, Lieutenant Brewer, Lieutenant Speer, and Captain Bewley were the hearing officers who evaluated the evidence presented during the I/A investigation and administrative hearing.[17]  Each made separate written findings and recommendations, which sustained most of the charges against Bracey.   All of them recommended that Bracey be terminated, except Sergeant Owens, who recommended that Bracey be suspended for 15 days. (*Doc. 43* at ¶¶ 31, 32; *Doc. 34-3* at pp. 46-63).

24.     Chief Thomas reviewed the recommendations from the reviewing officers and then made his independent, final decision to terminate Bracey's employment. (Thomas Aff., *Doc. 34-3*, p. 5, ¶ 12).

---

[15]  The photograph was made a part of the record in the administrative hearing.

[16]  In his Response to the City's Motion for Summary Judgment, Bracey does not address one important aspect of the photographs of Mary Bracey's injuries, which show marks on Mary Bracey's neck which are consistent with her being choked.  The marks on both sides of her neck are *not* consistent with her striking herself with a laptop computer.  (*See* Photos , *Doc. 34-3*, at pp. 32-34).  Additionally, it would have required Mary to hit herself repeatedly with the laptop computer – first to the eye area and then in the neck area.  During the administrative hearing, Bracey offered hearsay testimony that his wife had allegedly advised prosecutors that the marks on her neck were somehow caused by Bracey's watch.  (*Exh. 34-4*, at p. 37).

[17]  Of those four officers, only Lieutenant Brewer was not in Bracey's chain of command.

25.     Bracey appealed his termination to the Little Rock Civil Service Commission, which upheld Chief Thomas's decision.  (Stmt. of Facts, *Doc. 43* at ¶ 33).

26.     Bracey strongly denies that he violated General Order 310.  *See* ¶ 3, *supra*.  He contends that, because he "acted lawfully throughout the incident with his wife," he had no "firsthand knowledge of a domestic violence related incident." In other words, because he subjectively believed that he "acted lawfully throughout the incident," he was relieved of any obligation to self-report anything that happened at his home on December 9, 2011.  (*Doc. 43* at ¶ 31).

### III.  Discussion

Race discrimination claims under 42 U.S.C. § 1983, Title VII, and 42 U.S.C. 1981 are evaluated under the *same legal standards*. *See Schaffhauser v. United Parcel Service, Inc*., 794 F.3d 899, 902 (8th Cir. 2015) (Race discrimination claims under § 1981, Title VII and the Arkansas Civil Rights Act "are evaluated identically");  *Richmond v. Bd. of Regents of Univ. of Minn*., 957 F.2d 595, 598 (8th Cir. 1992) (applying the same legal analysis to discrimination claims under Title VII, § 1981, § 1983; and the Age Discrimination in Employment Act); *Briggs v. Anderson*, 796 F.2d 1009, 1021 (8th Cir. 1986) (confining discussion of plaintiff's claims to Title VII after finding that "[t]he inquiry into intentional discrimination is essentially the same for individual actions brought under §§ 1981

and 1983"); *Craik v. Minn.State Univ. Bd.*, 731 F.2d 465, 468 n. 5 (8th Cir. 1984) ("The issue of discriminatory intent is common to analyses under the Fourteenth Amendment, § 1983, and Title VII.").

Because Bracey offers no direct evidence of discriminatory intent, his discrimination claims must be analyzed using the *McDonnell Douglas*[18] burden-shifting framework.

First, Bracey has the threshold obligation of establishing a prima facie case of employment discrimination. *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-804. "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination." *Davis*, 421 F.3d at 704 (quotation and citation omitted).

Second, *if* Bracey establishes a prima facie case, "the burden shifts to the [City] to articulate a legitimate, non-discriminatory reason for its adverse employment action." *Id.*, at 704 (quotation and citation omitted).

Finally, *if* the City meets that burden of production, the presumption of discrimination disappears, and Bracey must then "prove that the [City's] proffered justification is merely a pretext for discrimination." *Id.* (quotation and citation

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

omitted).   At all times, Bracey "has the burden of persuasion."   *Id.*   (citation omitted).

### A.    Prima Facie Case

To establish a prima facie case of race discrimination, Bracey must show that: "(1)  he is a member of a protected class;  (2)  he met [the City's] legitimate expectations;   (3)   he suffered an adverse employment action;   and (4)   the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)."  *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854-854 (8th Cir. 2012).

It is undisputed that Bracey, as an African-American, is a member of a protected class and that the City terminated his employment.  Accordingly, the Court concludes that Bracey has established the first and third essential elements of his prima facie case of employment discrimination.

While the City contests whether Bracey has shown that he was meeting the City's "legitimate expectations" when he was terminated, it is undisputed that, before the December 2011 incident resulting in his termination, Bracey had worked as an LRPD patrol officer for 17 years.  During that time, he received only one disciplinary action, which resulted in a written reprimand.  (*Doc. 43*, at ¶ 4).

To establish that he was meeting the City's legitimate expectations at the time of his termination, Bracey need only show that he was qualified for the position. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 469-70 (8th Cir. 2011). Importantly, to make that showing, Bracey is "not required to disprove [his employer's] asserted reason for firing him." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (explaining that if a plaintiff was required to *disprove* his employer's alleged conduct violations, to establish a prima facie case, "the *McDonnell Douglas* burden-shifting analysis would collapse into the second element of the prima facie case").

Accordingly, the Court concludes that Bracey has made the showing necessary to establish the second essential element of his prima facie case of employment discrimination.

The problem for Bracey, in defending against the City's Motion for Summary Judgment, is that the undisputed material facts, even when viewed in a light most favorable to him, *show nothing* that could give rise to or support an inference that race discrimination played a role in Chief Thomas's decision to terminate him. "Evidence of pretext, normally considered at step three of the *McDonnell Douglas* analysis, can satisfy the inference-of-discrimination element of the prima facie case." *Lake*, 596 F.3d at 874. Bracey could have attempted to show such pretext, for example, by presenting evidence that the City: "(1) failed

16

to follow its own policies [in terminating him]; (2) treated similarly situated [police officers] in a disparate manner; or (3) shifted its explanation of the employment decision." (*Id*. at 874-875). Instead of presenting such facts in his Response to the City's Motion for Summary Judgment, Bracey makes only conclusory allegations and relies on speculative or hearsay opinions to support his claim that he was discharged because of his race. In contrast, the City has presented strong, objective evidence to support its position that Bracey was discharged "for cause" arising from his serious misconduct, which violated four LRPD rules and regulations and a General Order.

For the reasons explained below, the Court concludes, as a matter of law, that Bracey has failed to establish the fourth essential element of his prima face case, *i.e.*, "circumstances" surrounding his discharge that are capable of supporting an inference of race discrimination.

In his Response to the City's Motion for Summary Judgment, Bracey makes no showing of how he has satisfied his burden at stages one and three of the *McDonnell Douglas* burden shifting analysis, *i.e.*, *how* he has satisfied each of the elements necessary to establish a prima facie case of race discrimination; and *why* the City's racially neutral explanation for his discharge is a "pretext." Instead, almost all of Bracey's nine-page Response is devoted to: (1) an entirely subjective and self-serving discussion of the events that resulted in his termination;

(2)  broad and conclusory assertions that are not supported by *any facts* (*i.e.*, Chief Thomas was not trained "to do the right thing" by minority officers);  (3)  a request for the Court to take "judicial notice" of the LRPD's long history of discrimination against black police officers, without citing *any facts* to establish such a proposition;  and (4)  relying on hearsay and conclusory deposition testimony from other black officers in the LRPD who make vague and speculative allegations about white officers being treated more favorably.[19]    (Response, *Doc. 44*).

The Affidavit of Chief Thomas and the other exhibits filed in support of the City's Motion for Summary Judgment establish the following *undisputed facts*:  (1)

---

[19]  Bracey's Response cites generally to excerpts from the depositions of four other black officers in the LRPD.  The cited testimony of those officers is either not helpful, not admissible, or both.

For example, Bracey cites, without explanation, to the testimony of Lieutenant Johnny Gilbert, who offered his subjective opinion that Bracey's inter-racial marriage "caused tension" within the police department and in public.  He also opined that he found it "odd" or "extreme" that a BOLO was issued for Bracey.  (*Doc. 44* at p. 8;  Gilbert testimony, *Doc. 48-3*, at pp. 1-13).  In contrast, the City has offered the deposition testimony of Lt. Gilbert, who found Bracey's infractions to be "glaring" and, in his judgment, "an affront to anything that a police agency stands for."  According to Lt. Gilbert, such misconduct could not be tolerated "by anyone."  Lt. Gilbert specifically *could not recall* any white officers who engaged in similar conduct as Bracey and were treated more leniently.  (*Doc. 34-6* at pp. 2, 4).

Bracey also relies on the deposition testimony of LRPD officer Jonathan White.  He acknowledged he didn't have any personal knowledge of Bracey's termination "other than what [he had] heard."   (*Doc. 34-8* at p. 4).   Yet, Bracey cites to White's deposition testimony to support his assertion that similarly situated employees were treated more leniently.   A review of the cited testimony reveals nothing other than White's purely subjective opinion that Bracey may have been terminated because of his imposing size, 6'6" and 300-plus pounds, and the fact that his wife was white.  Yet, White also testified that, in his opinion, Bracey should have been terminated if there was "a very very strong suspicion" that he battered his wife.  (*Doc. 48-5* at pp. 4-5, 11).

Bracey has the burden of coming forward with *facts*, based on *admissible* evidence, that create "circumstances" capable of supporting an inference of discrimination in the City's decision to terminate his employment.  Bracey cannot meet that burden by polling officers sympathetic to his cause and having them offer conclusory and speculative opinions.

Bracey and his wife had a physical altercation in their home, in front of their children, on December 9, 2011;  (2)  Bracey's son and wife each called 911 and reported that Bracey had inflicted physical injuries on Mary Bracey during a domestic dispute;  (3)  Immediately after the fight, Bracey left the home;  (4) LRPD officer Amber Kalmer called Bracey shortly after the fight and told him police officers had been dispatched to his home on a domestic disturbance call;  (5) When police officers arrived at Bracey's home they found his wife with injuries that were consistent with domestic violence;  (6)  Rather than going home to meet with the officers investigating the incident, Bracey left Pulaski County and spent the night in a Saline County hotel;   (7)   Bracey did not call his supervisor or anyone else in his chain of command to report his *personal involvement* in "a domestic violence related incident," as required by LRPD General Order 310;  (8) On Friday night, a friend, Sgt. Burnett, called and told him that the LRPD had issued a BOLO, which described him as "armed and dangerous";  (9)  On Saturday morning, rather than turn himself in to the LRPD, Bracey left the State and drove to a casino in Greenville, Mississippi where he spent the rest of the day and night and did not return to Little Rock until Sunday afternoon;  (10)  While in the casino in Greenville on Saturday, at approximately noon, LRPD Sgt. Sloan called Bracey and told him that, Lt. Speer, a superior officer in Bracey's chain of command, had ordered Bracey to surrender in Little Rock by 1:00 p.m. on Saturday;  (11)  Bracey

disobeyed that order and remained at the casino, waiting until Sunday afternoon to drive back to Little Rock;  (12)  On Monday, Bracey surrendered to the LRPD and was suspended pending the outcome of a disciplinary investigation;  (13) After an I/A investigation and an administrative hearing on the disciplinary charges, Chief Thomas terminated Bracey for violating General  Order 310 and four other LRPD regulations related to the December 9, 2011 domestic violence incident and Bracey's subsequent misconduct.[20]

After considering all of the evidence developed during the I/A investigation and the administrative hearing, Chief Thomas (and Captain Bewley, Lieutenant Speers, and Lieutenant Brewer) *believed* that Bracey had choked and hit his wife and that he had violated General Order 310, as well as four separate Rules and Regulations.[21]  *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000)

---

[20]   Bracey has not disputed any of these facts, except to:  deny he caused any of his wife's injuries; claim she was the "aggressor" in the fight; and assert that all of her injuries were self-inflicted.  The Court must, at the summary judgment stage, accept Bracey's version of the facts as true.  However, even under his version of the facts, *he admits* to being involved in a serious "domestic violence related incident" with his wife.  Bracey is 6'5" and weighs 300-plus pounds.  (*Doc. 48-5*, at pp. 4-5).  The size differential between Bracey and his wife put her in considerable danger of being seriously injured even if Bracey did nothing more than the things he admits:  place his wife in a defensive head and chin hold;  pin her against the couch;  and let his left hand "fall around her neck" (whatever that means).  Accepting all those facts as true, the plain language of General Order 310 still required Bracey to report that "domestic violence related incident" to an officer in his chain of command.  Bracey admits that he never reported the incident to his immediate supervisor or to anyone else in his chain of command.

[21]   The additional violations included Rules and Regulations §§ 1/4002.00 (prohibiting "conduct unbecoming an officer");  § 1/4003.00 (prohibiting "any personal act or conduct which, if brought to the attention of the public, could result in justified criticism of that officer or the Department";  § 1/5006 ("failure or deliberate refusal of any officer to obey a lawful order";  §

("The relevant inquiry is whether the [employer] *believed* [the employee] was guilty of the conduct justifying the discharge.") (internal quotation omitted); *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) ("The normal rule in discrimination cases is that if an employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination.).

The Court's decision in *Richey* makes it clear that the relevant issue is *not* whether, as Bracey contends, his wife was the "aggressor" in the altercation and he was only "defending himself."  Rather, the narrow issue is whether Chief Thomas "honestly believed" the strong evidence that supported his decision to terminate Bracey for violating General Order 310 and the four other LRPD Rules and Regulations.  Bracey has offered *no facts* or *circumstances* capable of supporting an inference that his race played a role in Chief Thomas's decision or that his decision was based on anything other than his "honest belief" that the strong evidence of Bracey's serious and repeated misconduct over a three day period required him to fire Bracey.

In Bracey's Response to the City's Motion for Summary Judgment, the only "circumstances" he cites to support an inference of discrimination are:  (1)  vague,

---

1/8005.00 ("no officer shall willfully misrepresent any matter . . . or give false testimony" in a departmental investigation).

conclusory, and factually unsupported opinions expressed by him and several other black officers in the LRPD that Bracey was discharged because of his race;  and (2)  his contention that white and hispanic "comparators," who allegedly engaged in the same kind of conduct that resulted in his discharge,  were not terminated.[22] As explained below, Bracey has *not* made the required showing of *any* "other circumstances" capable of supporting "an inference of discrimination."

> **1.    The Vague, Conclusory and Unsupported Opinions Bracey Relies On To Show Race Played a Role In His Termination Are Not Sufficient To Support an Inference of Discrimination.**

Bracey believes that he did *nothing wrong* in the fight with his wife because she was the aggressor and all of the force he used against her was either to defend himself or to restrain her.  Based on the undisputed facts, no reasonable fact-finder could regard Bracey's version of events as anything other than far-fetched and unbelievable.  Among other things, it would require such a fact-finder to ignore: (1)  separate 911 calls placed by Bracey's wife and son immediately after the fight

---

[22]    In his Response, Bracey also requests the Court to take "judicial notice" that the LRPD disciplinary system operates "in an atmosphere previously known as the '[good] old boys system'" for which the LRPD has "previously been subjected to federal, court-ordered remediation." (*Doc. 44* at pp. 7-8).  Similarly, Bracey makes conclusory and vague references to "a favoritism system" that disparately impacted unnamed black police officers and created a "hostile work environment."  However, Bracey provides *no facts* to support any of those allegations.  (*Id*. at p. 8).

The *only issue* before this Court relates to Bracey's race discrimination claims – not those of other unnamed officers in other unspecified cases.  Accordingly, the Court *declines* Bracey's nebulous request that it take "judicial notice" of "the fact":  (1)  the LRPD once operated under a "[good] old boys system"; and (2)  it now operates under a "favoritism system" that disparately impacts black officers and creates a hostile work environment.

ended, which reported that Bracey had *hit and choked* Mary Bracey during a fight at their residence;[23] (2)  separate police statements made by Bracey's wife and son that were consistent with their 911 calls; and (3)  photographs of visible injuries to Mary's face and neck, consistent with being hit and choked by Bracey.  Finally, it would require the fact finder to believe Bracey's preposterous assertion that his wife's injuries were self-inflicted when she "accidentally" hit herself (apparently several times) with her daughter's laptop computer.[24]

Under LRPD General Order 310, any police officer "who witnesses or has firsthand knowledge of a domestic violence related incident involving a sworn member of [the LRPD] as the alleged suspect and who fails to officially report this information, will be subject to disciplinary action up to and including termination." On December 9, 2011, Bracey was a "sworn member of the LRPD" and he was personally involved in a "domestic violence related incident" with his wife.

---

[23]   While Markus's 911 call focused on Bracey choking his mother, in Mary's 911 call she stated that Bracey hit her.  While Bracey made much of this alleged discrepancy in his administrative hearing, he overlooked two very damaging aspects of their 911 calls:  (1)  they both claimed Bracey had used aggressive physical force (choking and hitting) against Mary;  and (2)  all of Mary's physical injuries were consistent with her being choked and hit.

[24]   Notably, of the total of five officers, including Chief Thomas, who evaluated Bracey's conduct and made findings of fact, four of them found that Bracey had hit and choked his wife.  (*Doc. 34-3*, at pp. 52-54, 56-62).  While Sergeant Owens did *not* find that Bracey's version of events was truthful, she rhetorically asked the following question:  "[C]an we be certain that the incident did not occur exactly as Officer Bracey said it did?"  Sergeant Owens also rhetorically asked whether Bracey's long tenure with the LRPD entitled him to "the benefit of the doubt." (Doc. 34-3 at p. 49).  By their findings, the other four officers answered the first question, "Yes" and the second question, "No."

Even under Bracey's own version of events, this regulation *required him* to "officially report" the physical altercation with his wife, even *if* all of his physical contact with his wife during the incident was defensive in nature.  The facts are undisputed that, after the fight, Bracey failed to make an official report of the incident to anyone in his chain of command.  Instead, despite knowing that the police had been dispatched to his house to investigate the fight, and that there was a BOLO out for him, he left Pulaski County to spend the night in a Saline County hotel and, the next morning, left the State to go to a casino in Greenville, Mississippi.  After arriving at the casino, Bracey disobeyed a direct order from an officer in his chain of command to turn himself in by 1:00 p.m. on Saturday in Little Rock.  Bracey remained at the casino until the next day, when he returned to Little Rock.  Finally, on Monday, three days after the domestic incident with his wife, he turned himself in to the LRPD.  During the subsequent I/A investigation, Bracey lied about speaking with Sergeant Burnett, one of the two supervisors outside of his chain of command, with whom he spoke during the twenty-four hours immediately after the incident.

In conclusion, the undisputed facts show that Chief Thomas terminated Bracey for violating General Order 310 and four other LRPD Rules and Regulations.  Bracey's papers filed in Response to the City's Motion for Summary Judgment contain *no facts* to support his *conclusory assertion* that he was

terminated because of his race.   Instead, Bracey has only come forward with vague, speculative, "opinion evidence," which is not capable of supporting an inference of race discrimination, the fourth essential element necessary for him to establish a prima facie case.  *See Richey*, 540 F.3d at 784.

### 2. Bracey Has Failed to Identify Any "Comparators" Capable of Supporting An Inference of Discrimination.

Relying on the evidence put forth by the City to support its Motion for Summary Judgment,[25] Bracey claims that several white or hispanic LRPD officers engaged in "similar misconduct," but were treated "more leniently," *i.e.*, they were not terminated.   In *Chappell v. Bilco Co.*, 675 F.3d 1110 (8th Cir. 2012), the Eighth Circuit made it clear that, even at the prima facie stage, the inquiry is whether the employees are "similarly situated in all relevant respects."   *Id.*, at 1118.  Thus, "'[w]hat is relevant is [whether they] are involved in or accused of the same offense and are disciplined in different ways.'"  *Id*. (quoting *Boner v. Bd. of Comm'rs*, 674 F.2d 693, 697 (8th Cir. 1982)).   The Court defined "all relevant respects" to mean "the conduct of the employees and any disparity in their discipline."  *Id*. at 1119 (citation omitted).

Importantly, while the City's summary judgment papers identify and discuss eight current or former LRPD officers, *only one* of *whom*, Cristie Young (a white

---

[25]  (*See*, *e.g.*, D*oc. 34-3*, at pp. 6-10;  *Doc. 34-4* at pp. 45-62).

female), is offered as a comparator.  The other seven officers are discussed in the context of explaining why none of them are "similarly situated" to Bracey, and therefore, are *not* valid comparators.

Chief Thomas determined that *both* Bracey *and* Cristie Young:  (1)  were the aggressor in a domestic violence incident;   (2)  failed to report the incident, a violation of General Order 310;   (3)  committed conduct unbecoming an LRPD officer, a violation of R&R § 1/4002.00;   (4)  engaged in conduct that would subject the officer and the LRPD to justified criticism, a violation of §1/4003.00; (5)  failed to obey a lawful order, a violation of § 1/5006.00; and (6)  gave untruthful statements in the investigation into the incident, a violation of § 1/8005.00.  (Letters of Termination, *Doc. 34-4*, at pp. 1-2, 45-47).[26]  Chief Thomas terminated Cristie Young for her misconduct, the *same penalty* he imposed on Bracey for his misconduct.[27]

In his Response, Bracey argues that Cristie Young is *not* a valid comparator. Instead, he argues that Chris Young, who was involved in the same domestic incident with Cristie, is a valid comparator.   Because Chief Thomas did not terminate Chris Young for his role in the domestic incident with Cristie, Bracey

---

[26]   Chief Thomas also found that Cristie Young had failed to report her "off-duty" employment, a charge that was not made against Bracey.  (*Doc. 34-4*, at p. 45).

[27]   Cristie Young appealed her termination to Pulaski County Circuit Court and was reinstated by Arkansas Circuit Judge Alice Gray.

claims it creates "other circumstances" that support an inference of race discrimination in connection with his discharge.

Chris Young is the *only* alleged comparator that Bracey identifies by name and discusses in his Response. However, he makes vague references to "other comparators," which broadly construed might include some of the seven other individuals identified and discussed by the City in its summary judgment papers.[28] Out of an abundance of caution, the Court will explain why the other seven LRPD officers identified by the City are *not* valid comparators.

### (a)    Cristie and Chris Young

Cristie and Chris Young were involved in a domestic altercation in an apartment complex parking lot on June 28, 2011.[29] At the time, they were married and both of them were LRPD officers. After the incident, neither "officially report[ed]" the incident to their chain of command. No evidence suggests the fight was serious enough that either party was injured or that police were called to investigate it. Nor does it appear that any domestic abuse related charges were filed against either Chris or Cristie.

---

[28]    Of course, the City's purpose in identifying and discussing all of those individuals, except Cristie Young, was to demonstrate why they were *not* valid comparators. It appears the City went to this effort because Bracey, during discovery, may have referred to those individuals as comparators, something he fails to do in his Response.

[29]    (*Doc. 34-4*, at p. 45-49).

Chief Thomas found that Cristie Young was "the aggressor," and that Chris tried to avoid the incident.   Although neither Cristie nor Chris sustained any injuries, Cristie was found to have engaged in the following serious misconduct *after* the incident:  (1)  she gained access to Chris Young's apartment by breaking open the back door;  (2)  she locked a sergeant out of the apartment;  (3) she failed to provide all the keys to the apartment despite being ordered to do so;  (4)  she contacted Chris Young after a superior ordered her not to do so;  and (5)  she was untruthful in statements to supervisors, Internal Affairs, and a Circuit Judge regarding the incident.[30]

 Chief Thomas terminated Cristie Young because her conduct, during and after the fight, violated numerous LRPD regulations.[31]  Chief Thomas found that Chris had failed to report a domestic incident but otherwise did *not* engage in any post-incident misconduct.  As punishment, Chris was suspended for two days.[32]

Albeit *not* as egregious, Cristie Young's misconduct clearly is very similar to Bracey's misconduct.   However, because she was also terminated, Bracey argues that she is *not* a valid comparator.   In doing so, he ignores all of the similarities in their misconduct and claims their cases are "fundamentally dissimilar" because:   Ms. Young was "clearly the aggressor"; she was a

---

[30]  (*Doc. 34-4* at p. 46).
[31]  (Stmt. of Facts, *Doc. 43* at ¶ 6;  Thomas Aff., *Doc. 34-3* at pp. 7-8;  Letters, *Doc. 34-4*, at 45-49).
[32]  (*Doc. 34-3*, at pp. 7-8; *Doc. 34-4*, at pp. 48-49).

supervisory officer held to a higher standard under departmental policy; and she had a more substantial record of prior disciplinary issues.  Of course, Chief Thomas also found Bracey to be "the aggressor" and, as a respected seventeen-year veteran of the LRPD, it is hard to see any distinction between Bracey and Ms. Young that might justify her being held to a "higher standard" as Bracey argues. Finally, while Bracey alleges that Ms. Young had a more substantial record of "prior disciplinary violations," that distinction is largely immaterial in light of the seriousness of their misconduct (particularly Bracey's) during *and* after their respective domestic altercations.[33]

As between Cristie and Chris Young, *only* Cristie Young is arguably similarly situated "in all relevant respects" with Bracey.  *Chappell*, 675 F.3d at 1119.  Unlike Bracey, Chris Young was not found to have engaged in *any* post-incident misconduct other than his failure to report the initial domestic incident. Finally, there is no suggestion that Chris Young was charged with a crime, attempted to avoid apprehension, fled the jurisdiction, refused a direct order from a superior officer, or made false statements during an I/A investigation.

Bracey has come forward with *no facts* suggesting that Chris Young is a valid comparator.  As a result, Chief Thomas's decision not to terminate Chris for

---

[33]  (*See* Stmt. of Facts, *Doc. 43* at ¶ 6;  Thomas Aff., *Doc. 34-3* at pp. 5-8;  Termination letter, *Doc. 34-4* at pp. 45-47).

his *much different conduct* during and after a domestic incident cannot be used by Bracey to support an inference of discrimination in connection with his own termination.

### (b)    Corey Hall & Lisa Hernandez

At the time of their domestic dispute, Officers Corey Hall, an African-American, and Lisa Hernandez, a Hispanic, were both LRPD officers.  While their domestic dispute "escalated into a physical confrontation,"[34] Chief Thomas noted that there were no visible injuries to either of them, and the evidence was insufficient to prove who was the victim and who was the aggressor.  Additionally, there was no extrinsic evidence that bolstered or detracted from the credibility of either officer; although Chief Thomas noted that Officer Hernandez admitted her guilt and exhibited a good attitude toward correction.  Chief Thomas suspended Hall for thirty days (which was later reduced to ten days) and suspended Hernandez for five days.[35]

Bracey has presented no facts suggesting that Hall engaged in any post-fight misconduct. Hernandez's only post-fight misconduct was calling Hall one time the day after the incident, something she was directed not to do.[36]   Neither of them was accused of a crime, left the jurisdiction to avoid apprehension for several days,

---

[34]   (*Doc. 34-4* at p. 57).

[35]   (Stmt. of Facts, *Doc. 43* at ¶ 8;  Thomas Aff., *Doc. 34-3*, at pp. 8-9;  Hall Letter, *Doc. 34-4* at p. 56-57;  Hernandez letter, *Doc. 34-4* at p. 50).

[36]   This was found to be a violation of R&R 1/5006.  (*Doc. 34-4* at pp. 58-59).

refused to obey a direct order from a supervisor to surrender, delayed turning themselves in to face pending criminal charges, or lied during an I/A investigation.

Bracey has come forward with *no facts* suggesting that Hall and Hernandez are valid comparators. As a result, the fact that neither of them was terminated, for engaging in *much different conduct*, during and after the domestic incident, cannot be used by Bracey to support an inference of discrimination in connection with his own termination.

### (c)    Fred Lee

On September 11, 2011, Fred Lee, a hispanic LRPD officer, and his wife were involved in a physical altercation at their Sherwood home. Police were called and responded. After the incident, Lee followed his wife to another residence in Alexander where a second physical altercation occurred. Police were once again dispatched. Based on these facts, Chief Thomas *terminated Lee*. However, he was later reinstated by the Civil Service Commission.

Nothing in the record suggests that, after the incident, Lee attempted to evade arrest, refused to turn himself in, or lied to I/A investigators.[37] Even without those additional violations, Chief Thomas decided to terminate Lee's employment,

---

[37]    The record does not indicate whether Lee was charged with a crime. Unlike Bracey, Lee was *not* found to have failed to obey a lawful order given by a supervisory officer (R&R §1/5006.00) or to have given false testimony in a departmental investigation (R&R § 1/8005.00).

the *same decision* he made regarding Bracey.[38]   Lee's situation, like Cristie Young's and Bracey's, underscored the seriousness with which Chief Thomas viewed domestic abuse incidents, particularly when the officer involved was the aggressor.

In Bracey's deposition, he speculated that Fred Lee's chain of command *knew* that the Civil Service Commission would reinstate his employment after Chief Thomas terminated him.  However, he later *admitted* that he had *no evidence* to support his speculation.[39]   Thus, while Bracey's Response refers to the "Fred Lee situation" as alleged *evidence* of "the arbitrary disciplinary system persisting in the department," there are *no facts* to support that conclusory assertion.[40]

To the extent that Bracey may be relying on Lee as a comparator, he was *not* treated more leniently than Bracey and, therefore, is not helpful to his case. Furthermore, there are no facts suggesting that Lee is a valid comparator to Bracey, and even if he was, he was *terminated* by Chief Thomas.  Thus, *nothing* about the circumstances surrounding Lee's termination by Chief Thomas and his subsequent reinstatement by the Civil Service Commission can even arguably support an inference of discrimination in connection with Bracey's termination.

---

[38]   Chief Thomas found that Lee:  (1)  failed to report the incidents to his supervisor in violation of General Order 310;  (2)  engaged in conduct unbecoming an LRPD officer in violation of R&R 1/4002.00;  and (3)  engaged in conduct that could result in justified criticism of the officer or the LRPD in violation of R&R 1/4003.00.  (Stmt. of Facts, *Doc. 43* at ¶¶ 9, 11, 12; *Doc. 34-4*, at 51-52;  Letter, *Doc. 34-4* at pp. 51-52).

[39]   (*Exh. 34-1* at pp. 27-28 ).

[40]   (Stmt. of Facts, *Doc. 43* at ¶ 12).

### (d)    James Youngblood

James Youngblood is white and a former LRPD officer.   On December 16, 2012, he was involved in a domestic incident with his wife.  His chain of command recommended his termination.  Chief Thomas concurred, but Youngblood *resigned* before the disciplinary process was completed.  While Youngblood did not face charges of failure to obey a lawful order or being untruthful during the investigation, he admitted to "a third domestic incident during the investigation."[41]

To the extent that Bracey may be relying on Youngblood as a comparator, he was *not* treated more leniently than Bracey and, therefore, is not helpful to Bracey's case.   Furthermore, there are no facts suggesting that Youngblood is a valid comparator, and even if he was, Bracey has shown nothing surrounding Youngblood's decision to resign that could support an inference of discrimination in connection with Bracey's termination.

### (e)    Robert Coors

Robert Coors is a white LRPD officer.   On October 18, 2012, he was involved in a domestic incident with his wife.  Even though Chief Thomas found that Coors was *the victim* in the case, he still suspended him for 20 days because

---

[41]   (*Doc. 34-4* at p. 53;  *Doc. 34-3* at p. 8).

Coors failed to report the incident.[42] Nothing suggests that Coors engaged in any post-incident misconduct.

Bracey fails to offer *any facts* to explain how he and Coors were "similarly situated in all relevant respects," the required legal standard for making Coors a valid comparator. In short, Bracey has shown nothing about Coors' much different and relatively minor misconduct, which resulted in his 20 day suspension, that is capable of supporting an inference of discrimination in connection with Bracey's termination.

### (f)   Arthur McDaniel

Arthur McDaniel is a white LRPD officer. McDaniel was involved in a verbal confrontation with another man who was having an extramarital affair with McDaniel's wife. Because *only words* were exchanged between the two men, there were no physical injuries. The "other man" obtained a misdemeanor warrant for McDaniels' arrest. McDaniel was relieved of duty until the misdemeanor charge was nolle prossed. There is no evidence that McDaniel engaged in any post-incident misconduct. As punishment for his misconduct, Chief Thomas suspended McDaniel for thirty days, without pay.[43]

While it is unclear whether Bracey proposes to rely on McDaniel as a comparator, the undisputed facts make that proposition legally unsustainable.

---

[42] (*Doc. 34-3* at p. 8;  Doc. 34-4 at pp. 54-55).
[43] (*Doc. 34-3* at p. 9;  Letter, *Doc. 34-4* at pp. 61-62).

Thus, nothing about McDaniel's much different misconduct, for which he received a suspension, is capable of supporting an inference of discrimination in connection with Bracey's termination.

### (g)   Dana Jackson

Bracey has offered the deposition testimony of Kaward Jolly, a black LRPD officer who was terminated for sleeping on duty, to support the contention that Dana Jackson, who is white, is a valid comparator.   In his deposition, Jolly expressed the speculative *opinion* that similarly situated white officers, who were charged with sleeping on duty or domestic incidents like the one involving Bracy, were not terminated or even subjected to serious disciplinary action.[44]

Jolly testified that "it was told" to him that Dana Jackson, a white lieutenant in the LRPD, got into a fight with his daughter's husband that resulted in serious injury, but Jackson was not disciplined.[45]  This vague hearsay testimony from Jolly is Bracey's *only support* for his argument that Jackson is a valid comparator.   At the summary judgment stage, the Court cannot consider hearsay testimony for any purpose, much less rely on it to find someone to be a valid comparator in a race discrimination case.  *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010).

---

[44]  (*Doc. 48-6*, pp. 1-9).   Jolly attended Bracey's civil service hearing and talked to Bracey and other officers about what happened.   Thus, it appears that all of the proffered portions of Jolly's deposition testimony are based on hearsay.

[45]  (*Id*. at pp. 1-2).

Chief Thomas's Affidavit states that Lieutenant Jackson responded to a domestic incident in which his daughter had been injured by her husband. Jackson had a physical altercation with his son-in-law. Chief Thomas noted that Jackson "immediately called and reported the incident," "had a positive attitude toward discipline" and "admitted his guilt." Chief Thomas found that Jackson's conduct had violated R&R § 1/4003.00 and issued him a letter of reprimand.[46] These undisputed facts in Chief Thomas's Affidavit make it clear that Jackson was in no way "similarly situated in all relevant respects" to Bracey such that he can be considered a valid comparator.

Thus, Bracey has presented no facts to establish that Jackson is a valid comparator, or that anything about Jackson's much different situation is capable of supporting an inference of discrimination in connection with Bracey's termination.

Based on the foregoing analysis, the Court concludes that Bracey has failed to establish *the fourth essential element* of his prima facie case, a fatal legal deficiency that entitles the City to summary judgment on all of Bracey's claims. Nevertheless, the Court will continue with its *McDonnell Douglas* analysis to demonstrate that, even *if* Bracey had been successful in establishing a prima face case, his Response fails to present *any evidence* of pretext capable of rebutting the City's "legitimate nondiscriminatory reason" for terminating his employment.

---

[46] (*Doc. 34-3* at p. 9).

## B.    Bracey Fails, At Step 3, To Present Any Evidence of Pretext

For purposes of this analysis, the Court assumes, arguendo, that Bracey's Response to the City's Motion for Summary Judgment establishes a prima facie case, thereby creating a rebuttable presumption of unlawful discrimination.   The Court must then consider whether the City's summary judgment papers establish "a legitimate nondiscriminatory reason" for terminating Bracey.  *Tyler v. Univ. of Ark. Bd. of Tr.*, 628 F.3d 980, 990 (8th Cir. 2011).

The City has produced an abundance of undisputed facts[47] to support Chief Thomas's decision to terminate Bracey for violating an LRPD Order and four different Rules and Regulations.  As a matter of law, that constitutes "a legitimate nondiscriminatory reason" for his termination.  *See Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.").  Thus, any "presumption of discrimination disappears, requiring [Bracey] to prove that the proffered justification is merely a pretext for discrimination." *Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012) (internal citation and quotation omitted).

---

[47]    The Court has already discussed the City's evidence in great detail in its recitation of the facts and in discussing whether Bracey satisfied the fourth essential element of a prima facie case.

At this final stage, Bracey "'must prove more than the prima facie case to show pretext, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.'" *Id*. (citing *Chappell v. Bilco Co*., 675 F.3d 1110, 1117 (8th Cir. 2012)).   Thus, Bracey must now establish the existence of "a genuine issue of material fact regarding pretext [which] merges with [his] ultimate burden of persuading the court that [he was] the victim of intentional discrimination." *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 954 (8th Cir. 2012).

Furthermore, if comparators are used to show pretext, the standard for determining whether such employees are "similarly situated" is "rigorous": "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct *without any mitigating or distinguishing circumstances*." *Id*. at 956 (emphasis added) (citing *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).   Finally, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972-73 (8th Cir. 1994) (internal quotation marks  and citations omitted).

The Court has already determined that Cristie Young is the only arguable comparator who is "similarly situated in all relevant respects" so as to permit a comparison *at the prima facie stage*.   The Court now concludes that she also is the

only potential comparator who is arguably "similarly situated" *at the pretext stage*. In deciding to *terminate* her employment, Chief Thomas found that:  (1) she was the aggressor in the domestic incident;  (2)  she failed to officially report the incident; and  (3)  after the incident she engaged in repeated violations of other Rules and Regulations, including disobeying a direct order and being untruthful. The fact that Cristie Young and Bracey both engaged in similar misconduct and were both terminated greatly undermines Bracey's claim that he was terminated because of his race.  As explained by the Court in its earlier analysis, all of the other LRPD officers mentioned by Bracey clearly are *not* valid comparators *at the prima facie stage*.  *A fortiori*, none of those LRPD officers are valid comparators *at the pretext stage*.

Finally, Bracey has presented *no facts* to support a finding in his favor on the issue of pretext.   The legitimate, nondiscriminatory reasons for Bracey's termination that are offered by the City "cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *Bone*, 686 F.3d at 955 (emphases in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-516 (1993)).

Even accepting Bracey's version of events and viewing those facts in a light most favorable to him, he has shown only that:  (1)  He did not hit or choke his wife;  (2)  The LRPD's investigation into the incident was flawed; and (3) He

should have not have been found guilty of violating some of the Rules and Regulations.   As a matter of law, this showing by Bracey is insufficient to demonstrate that the City's reasons for discharging him were a pretext.   This Court's role is *not* to second-guess the City's decision.   As the Eighth Circuit observed in *Hill v. St. Louis University*, 123 F.3d 1114, 1120 (8th Cir.1997) (internal citation omitted):

> Title VII [is] not meant to transform "at will" employment into perpetual employment where equal treatment is guaranteed to all employees and termination is legal only "for cause." Nor do these statutes entitle courts to "sit as super-personnel departments," second-guessing the wisdom of businesses' personnel decisions. Rather, these statutes serve the narrow purpose of prohibiting discrimination based on certain, discreet classifications such as age, gender, or race. These statutes do not prohibit employment decisions based upon poor job performance, erroneous evaluations, personal conflicts between employees, or even unsound business practices.

Accordingly, at the third step of the *McDonnell Douglas* analysis, Bracey's race discrimination claims fail because he has not made the required showing of pretext.

### C.   Bracey's § 1983 Claim that Chief Thomas Was Not Adequately Trained

Bracey has asserted, under § 1983, that Chief Thomas was not adequately trained to "do the right thing" by minority and female officers and that he failed to promote or maintain adequate training and practices to prevent discrimination in the LRPD.   To prove that a municipality is liable on a failure to train allegation,

Bracey must show "deliberate indifference." *City of Canton, Ohio v Harris*, 489 U.S. 378 (1989).   Thus, to prevail on this claim, Bracey must show that the inadequate training was " so likely to result in the violation of constitutional rights," that the City "can reasonably be said to have been deliberately indifferent to the need." *Parrish v. Ball*, 594 F.3d 993, 998 (8th Cir. 2010).   Here, there is *no evidence* from which a rational finder of fact could find a constitutional violation, arising from the City's decision to terminate Bracey.   Accordingly, as a matter of law, Bracey cannot prevail on his § 1983 failure to train claim.

## IV.  Conclusion

The Court concludes that in his Response to the City's Motion for Summary Judgment, Bracey has failed to present admissible evidence sufficient to allow a reasonable jury to return a verdict in his favor on any of his claims.[48]   As a result, the City is entitled to summary judgment on all of Bracey's claims, and

IT IS THEREFORE RECOMMENDED THAT Defendant City of Little Rock's Motion for Summary Judgment, *Doc. 34*, be GRANTED and that all claims asserted by Plaintiff John Bracey be DISMISSED, WITH PREJUDICE.

DATED this 15th day of November, 2016.

_____

UNITED STATES MAGISTRATE JUDGE

---

[48]   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).